TOWLE v. AMERICAN BUILDING, LOAN & INVESTMENT CO.[1]

(Circuit Court, N. D. Illinois.   January 4, 1897.)

BUILDING AND LOAN ASSOCIATIONS—POWER TO ACCEPT DRAFTS—NEGOTIABLE INSTRU-
MENTS.

    A building and loan association is not liable upon a draft fraudulently ac-
cepted by its vice president, even at the suit of an innocent holder, since such
associations have no power to accept drafts.

In Equity.   Suit by Marcus M. Towle against the American Build-
ing, Loan & Investment Company.   A receiver having been ap-
pointed, the firm of Grommes & Ullrich filed a petition praying that
the receiver be directed to pay them the amount of a certain accepted
draft.

Winston & Meagher, for petitioners.
Collins & Fletcher, for receiver.

GROSSCUP, District Judge.   The hearing under consideration is
on the petition of Grommes & Ulrich, co-partners, the answer of the
receiver thereto, and the stipulation entered into between the peti-
tioners and the receiver respecting the facts covering the case.
From these pleadings and the stipulation it appears that on the 4th
of October, 1893, the American Building, Loan & Investment Com-
pany, through its vice president, purported to accept a draft, at 60
days, for the sum of $1,608.47, drawn upon it by one George Mont-
gomery, in favor of the petitioners.   Like drafts had been previ-
ously drawn by the same Montgomery, and accepted by the vice
president of the society, in the name of the society.   Upon inquiry
by the petitioners, the vice president informed them that Montgom-
ery was a creditor of the society, and the draft presumably accepted
in the payment of such credit.   As a matter of fact, no indebtedness
existed to Montgomery.   The arrangement was, unquestionably, a
device between the vice president of the society and Montgomery,
under which Montgomery, on the credit of the society, would ob-
tain credit from the petitioners and others.

So far as the facts disclosed by the pleadings and stipulation go,
both the society and the petitioners are involuntary victims to this
fraud, and one or the other must bear its pecuniary loss.   Corpo-
rations act through their officers, and will not be heard to deny such
officers' authority in a given instance where such instance is within
the general field of their authority.   In other words, the public deal-
ing with a corporation, through its officers, is not required to know
such officers' authority for the special transaction in hand; it is
enough to know that such transaction is presumably under the gen-
eral authority conferred.   The corporation extending the authority,
not the public dealing upon the face of it, must suffer the loss if
there is any abuse of it by the officer in the particular transaction
in hand.   This rule is founded upon the essential conveniences of
commercial and corporate life, and is only holding that party liable

[1] Reported by Louis Boisot, Jr., Esq., of the Chicago bar.

for losses growing out of abuses of power who has it easiest in hand to prevent such abuses, either by the employment of none but honest agents, or the creation of a system of counterchecks or inspection that will speedily disclose any disposition to abuse their trusts. But corporations are not bound by the abuse of its officers when such act or abuse is wholly and clearly outside the field of the corporation's power. Neither the president nor the directory of a corporation can do such acts as the corporation itself has no power to do. The law of estoppel does not enlarge corporate power, and, in consequence, corporate liability. Where the powers of the corporation stop, the powers of its officers also stop, and that point of limitation the public are bound at their peril to know.

The acceptance of the draft under consideration is nothing more nor less than a promise to pay, at a future date, the sum named. Has the society the power, under the law, to execute promissory notes? It is not a commercial nor a banking institution, with the general powers incident to such concerns. It cannot borrow money, nor loan money, except such as is paid in by its members in the manner pointed out by the law, nor engage in any general business transactions. Its sole function is to consolidate the small savings of the many, and, by a system of unified loans, secure advantages to each contributor that he could not, perhaps, individually obtain. To this process of consolidation, and of loaning out the gatherings thereof, and their collection again with the interest thereon for redistribution, with such incidental powers as are necessary to make the process effective, the authority of the corporation is strictly confined. The usefulness of such corporations and their safety depend upon such strict limitation. To grant them, by judicial implication or intendment, a wider amplitude of power, would destroy the only safe assurance on which they are granted. What phase of this process demands or justifies the execution of promissory notes, or other evidences of indebtedness? Money actually obtained by such corporation can, of course, be recovered back on the equitable doctrine of money had and received. But, in view of the purposes for which this corporation was organized, what phase of its duties demands that it should have the right to execute promises to pay in the future? Of course, if a loose rein is to be given to their management, occasions may be easily pointed out when the creation of indebtedness by the execution of promissory notes might become advantageous. But the loose rein is the very thing the legislature intended to prohibit, and a tight rein is the only safe conduct the courts can adopt. This, the public dealing with them, or their officers, must either know or find out. My opinion is that the society itself had no power, in law, to execute the acceptance under consideration, and that, therefore, the act of the vice president is ultra vires. The decree will be against the petitioners.